UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 CV  10848 |
| v. | ) | |
| | ) | Jury Trial Demanded |
| VILLAGE OF TINLEY PARK, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

The United States of America, by its undersigned attorneys, files this complaint and alleges:

### I.       INTRODUCTION

1.       The United States of America brings this action against the Village of Tinley Park to enforce the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended 42 U.S.C. §§ 3601-3631.

2.       In February 2015, Buckeye Community SixtyNine, LP ("Buckeye") approached Tinley Park's Planning Department with a proposal to develop a three-story, forty-seven unit multi-family residential building to be known as The Reserve.

3.       The Reserve's units, if built, would be offered to persons making less than 60% of area median income, and would be occupied primarily by low, very low, or extremely low income households.  To facilitate rentals of these units, pricing at The Reserve would be below market and would be financed through the federal Low Income Housing Tax Credit (LIHTC) program, established in Section 42 of the Internal Revenue Code, 26 U.S. Code § 42.

4.      Based on the demographics of eligible residents in the area, black households in Tinley Park and the surrounding area would be approximately three times more likely to qualify for housing at The Reserve than white households.

5.      Buckeye engaged in a year-long planning process to purchase the land, design the project, obtain the necessary financing, and meet every requirement of Tinley Park's applicable zoning ordinance known as the Legacy Code.

6.      After the Planning Department found that The Reserve met all of the specifications of the Legacy Code, and after the Plan Commission had its first public meeting on the proposal, community opposition to The Reserve broke out.

7.      Community opposition to The Reserve was based on discriminatory attitudes towards African Americans and other groups based on race, with opponents suggesting that the prospective tenants would increase crime, lower property values, and negatively impact the schools.

8.      Tinley Park responded to the race-based opposition by sending the project back to the Planning Department for further review, which is where it has stayed ever since.

9.      Through its actions with respect to The Reserve, as described further herein, Tinley Park engaged in a pattern or practice of unlawful discrimination and denied rights to a group of persons on the basis of race and color in violation of the Fair Housing Act.

10.     Based on Tinley Park's discriminatory actions, the United States seeks declaratory and injunctive relief, as well as monetary damages and civil penalties.

## II.      JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331, 28 U.S.C. § 1345, and 42 U.S.C. § 3614(a).

12.     Venue is proper under 28 U.S.C. § 1391(b), because the events or omissions giving rise to the claims alleged herein occurred in the Northern District of Illinois and because the Defendant and the property at issue in this action are located there.

### III.     PARTIES

13.     Defendant Village of Tinley Park is an Illinois municipal corporation located in the Northern District of Illinois.

14.     The elected officials for Tinley Park include a Mayor and a six-person Board of Trustees.

15.     Tinley Park's current Mayor is David Seaman, a position he has held since June 2015.

16.     From August 2015 through March 2016, the Board of Trustees consisted of Michael Pannitto, Jacob Vandenberg, Brian Younker, Brian Maher, T.J. Grady, and Bernie Brady.

17.     In March 2016, Trustee Brady resigned.  Brady was replaced by Kevin Suggs in May 2016.

18.     The Board's composition has remained otherwise unchanged since May 2016.

### IV.     TINLEY PARK'S DISCRIMINATORY CONDUCT WITH RESPECT TO THE RESERVE

**A.     Tinley Park Has Adopted A Specific Plan and Code To Foster More Development, Including Multifamily Housing, In Its Downtown Area**

19.     In 2009, Tinley Park adopted the Legacy Plan, a comprehensive master plan for development of Tinley Park's downtown area.

20.     The Legacy Plan divides the downtown area into multiple districts, and specifies the proposed uses that are to be allowed for each district.

21.     The Reserve was proposed for an area that the Legacy Plan designates as the Gateway District.  The Gateway District is intended for Civic, Institutional, Office, and Multifamily uses.  While "Neighborhood Commercial" and "Mixed Use" are intended uses for other parts of the Legacy Plan area, these are not intended uses in the Gateway District.

22.     In 2011, the Board of Trustees approved the Legacy Code to implement the Legacy Plan.

23.     The Legacy Code is a set of building requirements and administrative procedures applicable to development in the downtown core of Tinley Park.

24.     The administrative procedures established in the Legacy Code are intended to streamline approvals of proposed developments that conform to the Code's requirements. Toward that end, the procedures provide for an interactive process between developers and the Planning Department.

25.     Upon review of the proposal, the Planning Department determines which of three meeting and approval processes described in the Legacy Code should apply in each case based on the relative conformity of the project to the Legacy Plan and Legacy Code.

26.     To determine which process to follow, the Planning Department is charged with deciding whether a given project's conformity to the Legacy Code amounts to "precise conformance," "moderate conformance," or "non-conformance and special approvals."

27.     A project is in "precise conformance" if it matches the development scenarios presented in the Legacy Plan, requires no variances from the Legacy Code, and needs no special approvals.

28.     Projects deemed to be in "precise conformance" with the Legacy Code require the fewest meetings and levels of approval.  The process begins with an interactive staff review,

4

which is later followed by a review by the Plan Commission.  If the Plan Commission disagrees with the Planning Department's recommendation to approve a project, the process is for the Plan Commission to hold a work session.

29.     The Plan Commission has the ultimate authority over whether or not to issue an approval for a project that is in "precise conformance" with the Legacy Code.  The Board of Trustees has no authority over the approval of such projects.

30.     Like the Legacy Plan, the Legacy Code divides the downtown area into multiple districts and specifies the types of uses that are favored in each district.  The area that the Legacy Plan had referred to as the "Gateway District" is termed the "Neighborhood Flex District" in the Legacy Code.

31.     The Legacy Code's intended uses for the Neighborhood Flex District are similar to the Legacy Plan's intended uses for this area.  Specifically, the Legacy Code states that the requirements for the Neighborhood Flex District are aimed at "creat[ing] a mix[] of commercial and multi-family uses."

32.     As originally enacted, the map in the Legacy Code included the notation "street level commercial required" at specified parts of the Neighborhood Flex District, including the area where The Reserve would eventually be proposed, as well as in another district.  The Code did not define or otherwise explain what was meant by "street level commercial."

33.     On October 6, 2015, Tinley Park's Board of Trustees passed Ordinance No. 2015-O-045.  That ordinance made certain amendments to the Legacy Code, including removing the "street level commercial required" from the two districts where it had previously been included, including the Neighborhood Flex District, and replacing that language with the term "street level commercial permitted," a designation that already appeared in other parts of the Legacy Code.

34.     The purpose of the amendments was to conform the Legacy Code with a number of projects that were under review by the Planning Department and had otherwise met the goals and requirements of the Legacy Plan and Legacy Code.

35.     The Trustee who moved to adopt the amendments, Trustee Vandenberg, explained the changes as follows:   "The Legacy Code for Downtown Tinley Park was adopted in 2011.  During the last year, several new projects have come forward for review within the area governed by the Legacy Code.  As they have conducted reviews, planning staff has identified several areas of the code that should be amended . . . ."

**B.     There Is A Dearth Of Affordable Housing In Tinley Park And Its Surrounding Housing Markets**

36.     There is a strong need for, and short supply of, housing that is affordable to low income, very low income, and extremely low-income households in Tinley Park and the surrounding housing markets.

37.     Standards adopted by the Department of Housing Urban Development define "low income family" as a family whose annual income does not exceed 80% of the median income for the area, a "very low income family" as a family whose annual income does not exceed 50% of the median family income for the area, and an "extremely low income family" as a family whose annual income does not exceed 30% of the median family income for the area. 24 C.F.R. § 5.603.

38.     As a general rule–both in Tinley Park and its surrounding area, and elsewhere–it is very difficult for low income, very low income and extremely low income families to find housing that is affordable to them in the private housing market, unless they have a Housing Choice Voucher, a portable rental subsidy issued pursuant to section 8(o) or section 8(t)  of the U.S. Housing Act of 1937, 42 U.S.C. 1437f, or unless the housing is supported by some other

subsidy or financial mechanism that allows the provider to offer rents at below the market rental rate to low income families.

39.     There are currently no housing developments for general occupancy or families with children in Tinley Park that offer below-market-rate rental housing.

40.     The only housing development in Tinley Park that offers below market-rate-rental housing is Brementowne, which is restricted to persons aged 62 years old or older.

41.     The only non-age-restricted housing development in the market area surrounding Tinley Park that offers below-market-rate rental housing is Pheasant Ridge, located in Orland Park.  Pheasant Ridge is fully occupied and has a waiting list.

**C.      Buckeye's Proposal For The Reserve**

42.     Buckeye contacted the Planning Department in February 2015 with its proposal to build The Reserve on a vacant parcel located at the northeast corner of Oak Park Avenue and 183rd Street.

43.     Buckeye informed the Planning Department that The Reserve would be financed through the Low Income Housing Tax Credit (LIHTC) Program.

44.     Created by the Tax Reform Act of 1986, the Low Income Housing Tax Credit (LIHTC) program allows qualified state and local housing finance agencies to issue tax credits for the acquisition, rehabilitation, or new construction of rental housing targeted to lower-income households.

45.     In Illinois, Low Income Housing Tax Credits are administered by the Illinois Housing and Development Authority (IHDA).

46.     Buckeye submitted an application to IHDA for a Low-Income Housing Tax Credit allocation to fund The Reserve in the summer of 2015.  The IHDA approved Buckeye's application in October 2015.

47.     In its application for the tax credits, Buckeye committed that 17 of the 47 units would be affordable to persons making 60% or below the median income, 22 of the units would be affordable for persons making 50% or below the median income for the area, and seven of the units would be affordable for persons making 30% or below the median income for the area. One unit would be a market-rate unit.

48.     Buckeye also committed that 17 of the 47 units would be subsidized by project-based vouchers, under which tenants pay 30% of their income in rent and the voucher covers the remainder.

49.     Buckeye submitted conceptual drawings of The Reserve to the Planning Department in April 2015.

50.     Buckeye and the Planning Department engaged in a series of meetings about The Reserve development, consistent with the process for obtaining approval for developments as contemplated by the Legacy Code.

51.     Buckeye submitted its final application for The Reserve to the Planning Department on December 11, 2015.

52.     The Planning Department issued a final staff report on The Reserve dated January 21, 2016.

53.     The Planning Department's report noted that the proposed land use, site plan, parking, setbacks, and minimum dwelling sizes met the code requirements for the Neighborhood Flex District and concluded that The Reserve was in "precise conformance" with the requirements for the Neighborhood Flex District.

54.     The report also noted that no variances had been requested and no review by the Board of Trustees was required.

55.     The report further noted that because of some remaining open issues, the review will include two public meetings in front of the Plan Commission before approval is granted.

56.     At a Plan Commission meeting on January 21, 2016, Paula Wallrich—Tinley Park's Deputy Planning Director—commented that The Reserve conforms to what was envisioned by the Legacy Code, that the project met all Neighborhood Flex District requirements, and that the only remaining open items pertained to a final engineering review that was not yet complete.

57.     At the same meeting, Plan Commission Chairman Rita Walker commented that The Reserve was the type of building and use slated for the project's location under the Legacy Plan and Legacy Code.

58.     Chairman Walker set the timetable for a vote on The Reserve project for a meeting to be held on February 4, 2016.

**D.      Community Opposition To The Affordable Housing Project**

59.     The Daily Southtown reported on the January 21, 2016 Plan Commission meeting in an article published on January 22, 2016 and titled "Affordable housing complex planned for Tinley Park."

60.     Immediately after the article came out, Tinley Park residents initiated a campaign to oppose and stop development of The Reserve.

61.     Opponents organized and disseminated information about The Reserve via two Facebook groups: "Concerned Citizens for Tinley Park" and "Citizens of Tinley Park."

62.     Trustee Brian Younker is a member of the Citizens of Tinley Park Facebook group.

63.     Trustees Pannitto, Vandenberg, and Younker moderate the Concerned Citizens for Tinley Park Facebook group.

64.     A significant portion of comments made in threads on both Facebook groups are disparaging towards future residents of The Reserve.  Some of the comments include the following:

a.     "This type of low income housing shouldn't exist in tinley!!! Especially next to a school!"

b.     "This needs to be stopped.  It will bring so much crime and ruin tinley."

c.     "Wth, we pay high taxes and house prices to live in HUD neighborhoods, thats BS."

d.     "Great.  We all know what happens in these units and I don't think teachers or police officers will be living in them.  I know there are decent people out there that need help, but they do not exceed the ones who will destroy the building and Tinley Park."

e.     "Whitey doesn't have a chance."

f.     One commenter posted a photo of an African American man pouring malt liquor on a gravestone.  Another commenter asked:  "Is that one of the hopeful occupants?"

65.     Threads in both Facebook groups encouraged readers to attend a February 2, 2016 meeting of the Board of Trustees to make their opposition to The Reserve known to the elected officials.

66.     The Facebook groups' threads described contact between Tinley Park residents and elected officials expressing their concerns that development of The Reserve would depress property values and increase crime.

10

67. The Board of Trustees and Mayor were aware that Tinley Park residents opposed The Reserve and that the opposition was based, in part, on the race of prospective tenants.

68. Approximately 300 persons attended the February 2, 2016 meeting of the Board of Trustees.

69. At the February 2 meeting, residents of Tinley Park voiced their objections to The Reserve, citing concerns that development of The Reserve would depress the value of surrounding properties, induce "outsiders" to move to Tinley Park, and that the new residents would enroll their children in Tinley Park's school system.

70. Residents also expressed their concern that tenants of The Reserve would require government services, the cost of which would exceed the tax revenue generated by The Reserve.

71. Trustee Maher—in response to a question from an audience member asking how he would vote on approval of The Reserve project—observed that The Reserve project was not before the Board of Trustees for approval because it met all the requirements of the Legacy Code and, therefore, was not subject to a vote by the Trustees, so that any attempt by the Trustees to vote The Reserve approval down would "invite a lawsuit for discrimination."

**E.** **Tinley Park Capitulates To Racially Motivated Community Opposition**

72. The Plan Commission held a public meeting regarding The Reserve on February 4, 2016.

73. In response to community opposition, at the February 4 meeting, Mayor Seaman requested the Board of Trustees retain special counsel to review the Legacy Code in conjunction with a group of appointed citizens.

74. At the same meeting, Trustee Vandenberg requested that the Plan Commission table its consideration of The Reserve.

75.     Vandenberg suggested that tabling a vote on The Reserve was necessary to allow him to complete his "own due diligence on the process and the transparency of the project," and not "because of affordable housing."

76.     Vandenberg did not explain why his approval (or the Board of Trustee's approval) would be needed for The Reserve given that the Planning Department had found the project to be in "precise conformance" with the Legacy Code.  Nor did he identify a basis for concluding that the project was not in "precise conformance."

77.     The Plan Commission accepted Vandenberg's request and voted to refer The Reserve project back to the Planning Department for further review.  The Plan Commission did not specify what basis justified this action, nor did it provide any guidance as to what issues—if any—the Planning Department was to consider in its review.

78.     The Legacy Code provides that if the Plan Commission disagrees with the Planning Department's determination, it must hold a work session to determine whether the project is in "precise conformance" and, if not, in what areas it is deficient.

79.     The Plan Commission's act of referring The Reserve project back to the Planning Department for further review without a determination that the proposal was not in "precise conformance" with the Legacy Code is a departure from the process for approving projects set forth in the Legacy Code.

80.     Following the Plan Commission's vote to refer The Reserve project back to the Planning Department, residents of Tinley Park voiced further objections to The Reserve, including that The Reserve would depress property values, increase the crime rate, and expose residents of Tinley Park to increased personal safety risks.

81.     A resident at the February 4 meeting cited Calumet City (a majority African American city located in the vicinity of Tinley Park) as a comparator for The Reserve that, according to the resident, counseled in favor of denying approval for the project.

82.     Residents at the February 4 meeting cited the Robert Taylor Homes, the Ickes Homes, the Dearborn Homes, and the ABLA Homes (each a majority African American public housing project previously or currently operated in Chicago) as comparators for The Reserve that they contended counseled in favor of denying approval for the project.

83.     Residents continued to make disparaging comments directed at prospective residents of The Reserve and the impact the new residents would have on Tinley Park's racial demographics on the Concerned Citizens for Tinley Park and Citizens of Tinley Park Facebook groups.  Some of the comments include the following:

> a.    "Why not build it on 191st and Harlem.  Oh yeh because it wouldn't fit in with Brookside Glen.  The future of Tinley is looking more and more like Harvey."  The population of Harvey, Illinois is approximately 76% African American and 3% white.

> b.    "I'll bet my life savings that this place is overrun by garbage within a year or two," to which another resident responded, "Village of Tinley Park rolling out the Matteson plan I see."  The population of Matteson, Illinois is approximately 81% African American and 15% white.

> c.    "So the people who don't work at all & work the system will qualify. . . ? How is this not 'section 8'. . . It's the same thing except the name 'section 8' doesn't have a good ring to it anymore, pretty soon 'affordable housing; will have the same affect.  I grew up here but will definitely be moving

> before the value in TP turns to total shit . . . All the shit from country club
>
> hills and matteson will soon be crossing over into Tinley . . . Peace out!!"
>
> The population of Country Club Hills, Illinois is approximately 87%
>
> African American and 9% white.

84.     The Planning Department has not requested additional information about The Reserve from Buckeye since the Plan Commission referred the project back to the Planning Department in February 2016.

85.     Shortly after the February 4 meeting, seven of the nine members of the Plan Commission resigned.

86.     Seven new members were appointed to the Plan Commission in April 2016.  At least one of the appointees has been active in organizing community opposition to The Reserve.

87.     Tinley Park passed Ordinance No. 2016-O-012 in March 2016.

88.     The March 2016 ordinance established an office of independent inspector general for Tinley Park "to investigate the processes and activities related to the review of [t]he Reserve" and designated the Cook County Sheriff to serve as inspector general.

89.     Community members opposed to The Reserve filed a lawsuit against Tinley Park and certain Tinley Park elected officials and staff.  *Stuckly v. Village of Tinley Park, et al.*, No. 2016-CH-3974 (Cook County Chancery).

90.     The *Stuckly* lawsuit sought to invalidate the October 2015 ordinance, which had amended the Legacy Code to, among other things, remove the "Street Level Commercial Required" designation for the portion of the Neighborhood Flex Zoning District that included the Reserve site and replace it with a "Street Level Commercial Permitted" designation.

91.     Community members opposed to The Reserve have contended that, absent the October 2015 ordinance, The Reserve would not be in conformance with the Legacy Code.

92.     The *Stuckly* lawsuit claimed that the October 2015 ordinance was void because pre-enactment public notice about the ordinance was inadequate.

93.     Specifically, the *Stuckly* complaint alleged notice was not adequate because the notice incorrectly described the amendment as a change to the phrase "Street Level Commercial Allowed" when in fact it was a change to "Street Level Commercial Permitted," and because the notice described the change as affecting the Neighborhood General Zoning District, when in fact it affected the Neighborhood Flex Zoning District.

94.     Tinley Park passed Ordinance No. 2016-O-025 in May 2016, which rescinded the October 2015 ordinance challenged by the *Stuckly* lawsuit.

95.     Community members opposed to The Reserve have since contended the May 2016 ordinance renders The Reserve proposal retroactively out of conformance with the Legacy Code.

96.     Tinley Park's actions were taken in response to community opposition based on the race and racial stereotypes of the prospective tenants of affordable housing.

97.     Tinley Park's application of its zoning and land use laws—and its departure from the procedures established by the Legacy Code—have the intent and effect of discriminating against prospective black tenants and residents of Tinley Park.

**F.      Tinley Park's Actions With Respect To The Reserve Disproportionately And Adversely Affect Black Persons**

98.     According to the most recent data from the United States Census Bureau (2010), Tinley Park's racial composition was 88.8% white, 3.7% African American, 3.9% Asian, and 6.9% Hispanic or Latino.

99.     Tinley Park is part of Cook County, which is within the Chicago-Joliet-Naperville Metropolitan Statistical Area.  In 2010, Cook County's racial composition was 55.4% white, 24.8% African American, 6.2% Asian, and 24.0% Hispanic or Latino as of the 2010 United States census.

100.    Buckeye's project would have provided housing for individuals making 60% or less of the area median income ("AMI"), which is $44,999 or less.

101.    Black households in Tinley Park and the surrounding housing market areas are more likely to qualify for housing at The Reserve than are white households in that area.

102.    In the Chicago-Joilet-Naperville Metropolitan Statistical area, the odds of a black family qualifying for housing at The Reserve (earning less than $44,999) are approximately three times greater than the odds of a white family qualifying for such housing, which is statistically significant at the 95% confidence level.

103.    In Tinley Park, a black family is roughly four times more likely to qualify for housing at The Reserve than a white family, a disparity that is statistically significant at the 95% confidence level.

**V.     TINLEY PARK'S CONDUCT VIOLATES THE FAIR HOUSING ACT**

104.    By the conduct set forth above in paragraphs 1-103, Tinley Park has (1) made dwellings unavailable or denied dwellings to persons because of race or color, in violation of 42 U.S.C. § 3604(a); and (2) interfered with persons in the exercise or enjoyment of rights granted by 42 U.S.C. § 3604, in violation of section 3617.

105.    Based on the foregoing conduct, Tinley Park has engaged in:

       a.     A pattern or practice of resistance to the full enjoyment of rights granted
              by the Fair Housing Act, in violation of 42 U.S.C. § 3614(a); and

b.      A denial to a group of persons rights granted by the Fair Housing Act, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

106.    Tinley Park's discriminatory conduct or actions as set forth above were intentional, willful, and taken in disregard for the rights of others.

107.    Buckeye is an aggrieved person within the meaning of 42 U.S.C. § 3602(i) and section 3614(d)(1)(B).  On information and belief, there are others who are aggrieved persons who have been or will be injured by defendant's actions.

WHEREFORE, the United States requests that this Court (1) declare that Tinley Park's conduct, as alleged, violates the Fair Housing Act; (2) prohibit Tinley Park, its officers, employees, agents, successors and all other persons in active concert or participation with it, from discrimination on the basis of race or color in violation of the Fair Housing Act, including further making unavailable or denying a dwelling because of race; (3) require that Tinley Park approve Buckeye's proposal to build affordable housing at the northeast corner of Oak Park Avenue and 183rd Street in Tinley Park; (4) require that Tinley Park take affirmative steps to comply with the Fair Housing Act, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate the effects of its unlawful housing practices as described herein; (5) award monetary damages, pursuant to 42 U.S.C. § 3614(d)(1)(B), to all aggrieved persons harmed by the Tinley Park's discriminatory practices; (6) assess a civil penalty against Tinley Park in an amount authorized by 42 U.S.C. § 3614(d)(1)(C) to vindicate the public interest; and (7) order such other relief as the interests of justice may require.

Respectfully submitted,

LORETTA E. LYNCH
Attorney General

ZACHARY T. FARDON                          VANITA GUPTA
United States Attorney                     Principal Deputy Assistant Attorney General
Northern District of Illinois              Civil Rights Division

s/ Michael J. Kelly                        SAMEENA SHINA MAJEED
MICHAEL J. KELLY                           Chief
Assistant United States Attorney
Northern District of Illinois
219 South Dearborn Street, 5th Floor       s/ Amie S. Murphy
Chicago, Illinois  60604                   TIMOTHY J. MORAN
Phone:  (312) 353-4220                     Deputy Chief
michael.kelly@usdoj.gov                    AMIE S. MURPHY
                                           Trial Attorney
                                           Housing and Civil Enforcement Section
                                           Civil Rights Division
                                           U.S. Department of Justice
                                           950 Pennsylvania Avenue, NW
                                           Northwestern Building, 7th Floor
                                           Washington, D.C. 20530
                                           Phone:  (202) 353-1285
                                           amie.murphy2@usdoj.gov